# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| SCOTT A. LEMIEUX, | Civil No. 16-1794 (JRT/HB) |
| Plaintiff, | |
| v. | **SEALED MEMORANDUM OPINION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT** |
| SOO LINE RAILROAD COMPANY, | |
| Defendant. | |

Thomas W. Fuller, **HUNEGS LENEAVE & KVAS**, 1000 Twelve Oaks Center Drive, Number 101, Wayzata, MN 55391, for plaintiff.

Margaret M. Bauer Reyes and Tracey Holmes Donesky, **STINSON LEONARD STREET LLP**, 50 South Sixth Street, Suite 2600, Minneapolis, MN 55402, for defendant.

Plaintiff Scott A. Lemieux, a train conductor, brings this action against his former employer, Soo Line Railroad Company, doing business as Canadian Pacific Railway ("CP"), alleging that CP violated his rights under the Federal Railroad Safety Act ("FRSA") by retaliating against him for protected activities. Lemieux alleges that he made good faith reports of hazardous and unsafe brakes and, as a result, suffered adverse employment actions in the form of investigations, a five-day suspension, and, ultimately, termination. Presently before the Court are the parties' cross-motions for summary judgment. Because genuine disputes of material fact remain as to all issues, the Court will deny both motions.

**BACKGROUND**

## I.   FACTUAL BACKGROUND

CP provides freight rail transportation in Minnesota and other Midwest states. (Decl. of Amanda Cobb ("Cobb Decl.") ¶ 3, Mar. 30, 2018, Docket No. 108.)  Lemieux worked as a unionized conductor for CP from May 2008 until his dismissal in April 2015. (Decl. of Thomas W. Fuller ("Fuller Decl.") ¶ 3, Ex. 11 at 38, 40, Mar. 30, 2018, Docket No. 105.)  Conductors are required to oversee and maintain the car portion and movement of the train.  (Decl. of Tracey Holmes Donesky ("Donesky Decl.") ¶ 2, Ex. A ("Lemieux Dep.") at 34, Mar. 30, 2018, Docket No. 159.)  They also perform inspections.  (*Id.*) Lemieux recognizes that being a conductor is a "safety sensitive" job.  (*Id.*)

### A.   CP's Operating Rules and Instructions

Lemieux acknowledges that he was required to know, understand, and comply with CP's General Code of Operating Rules ("GCOR"), (*id.* at 35), which include the following:

**1.1  Safety**
Safety is the most important element in performing duties.
. . .
**1.1.1  Maintaining a Safe Course**
In case of doubt or uncertainty, take the safe course.

**1.29  Avoiding Delays**
Crew members must operate trains and engines safely and efficiently.  All employees must avoid unnecessary delays.

**1.4  Carrying Out Rules and Reporting Violations**
Employees must . . . report any condition or practice that may threaten the safety of trains, passengers, or employees
. . . .

### 6.29.1 Inspecting Passing Trains

> Employees must inspect passing trains. If they detect any of the following conditions, they must notify crew members on the passing train by any available means . . . . When a train is stopped and is met or passed by another train, crew members must inspect the passing train.

(Donesky Decl. ¶ 7, Ex. F at 23, 24, 26, Mar. 30, 2018, Docket No. 158; Decl. of Thomas W. Fuller in Opp. to CP's Mot. for Summ. J. ("2d Fuller Decl.") ¶ 3, Ex. 30 at 1, Apr. 20, 2018, Docket No. 211.)

GCOR 6.29.1 refers to "roll-by" inspections. (Lemieux Dep. at 45.) Lemieux was aware of the roll-by requirements and responsible for performing roll-by inspections. (*Id.* at 35, 45.) He describes roll-by inspections as follows: "you're . . . on the ground and looking at trains that are passing by for any fatigue with any of the cars, any mechanical issues, any safety issues or anything like that that need[s] to be brought to the attention of the . . . passing train." (*Id.* at 35.)

Conductors must also understand and apply CP's General Operating Instructions ("GOI"), which includes a rule regarding brake shoes:

### 1.8 Brake Shoes

> Car brake shoes will be removed when they reach the following indicated thickness, measured at the thinnest point of the shoe:
>
> | Shoe Type | Freight Service |
> |-----------|-----------------|
> | Cast Iron | 1/2 inch |
> | Composition | 3/8 inch (including backing) |

(Donesky Decl. ¶ 8, Ex. G at 33, Mar. 30, 2018, Docket No. 158.)  Lemieux says that he was aware of this rule but was never trained on it.  (Lemieux Dep. at 46.)[1]

### B.     CP's Discipline Policy

CP's U.S. discipline policy in place at the time of Lemieux's termination states: "Infractions will be dealt with using progressive discipline, unless they warrant outright dismissal."  (Cobb Decl. ¶ 4, Ex. B at 23, March 30, 2018, Docket No. 109.)  According to this progressive discipline policy, a first infraction results in a 5-day unpaid suspension, a second infraction results in a 10-day unpaid suspension, a third infraction results in a 30-day unpaid suspension, and a fourth infraction results in dismissal.  (*Id.*)  However, the policy also states that, "[d]epending on the gravity of the situation and the specific circumstances, a 10 or 30 day suspension (or dismissal) may be assessed for the first infraction."  (*Id.*)  The policy contains a non-exhaustive list of situations that might warrant immediate dismissal.  (*Id.* at 24.)

### C.     Lemieux's Prior Performance Issues

In February 2013, Lemieux was noticed for a Collective Bargaining Agreement ("CBA") hearing regarding a rule violation by his crew.  (Lemieux Dep. at 49.)  The hearing was canceled when the crew's engineer accepted responsibility for the violation, but Lemieux received informal counseling and was required to attend briefings.  (*Id.* at 49-50.)  In January 2015, Lemieux received a notice that he was "in violation of the T&E

---

[1] In contrast, mechanical personnel have "more extensive training in air brake testing and maintenance that provides for more detailed inspection."  (Fuller Decl. ¶ 3, Ex. 4 at 22.)

- 4 -

Availability Standard" because he was absent (reported as "sick") on December 23 and 24, 2014. (Donesky Decl. ¶ 10, Ex. I at 35, Mar. 30, 2018, Docket No. 158.) CP informed him that his attendance issues were "being monitored" and would be "handled consistent with the enclosed Availability Standard and US Discipline Policy 5612" and that "[f]uture infractions could result in discipline up to and including dismissal." (*Id.*)

### D. First Alleged Protected Activity: Brake Report (February 12, 2015)

#### 1. Report

On February 12, 2015, Lemieux reported: (1) brakes for being too thin in violation of GOI 1.8, and (2) a severely leaking air hose. (Fuller Decl. ¶ 3, Ex. 2 ("Train Profile") at 17-20; Lemieux Dep. at 55-56.)

That morning, CP called Lemieux for work in Glenwood, Minnesota, starting at 10:25 a.m. (Lemieux Dep. at 53.) Lemieux and his engineer, ███████, had to review paperwork in Glenwood and then travel two hours to Dickinson to get on a train there. (*Id.* at 53-54.) The profile for their assigned train, CP-490-09, shows that the train had 150 cars, 111 of which were fully loaded, and weighed approximately 15,684 tons. (Train Profile at 17.) Numerous cars contained dangerous or hazardous materials. (*Id.* at 17-19.)

Before moving the train, Lemieux and ██████ were required to conduct a Class I Air Test. (Lemieux Dep. at 54.) Lemieux started this test at approximately 1:00 or 1:30 p.m. (*Id.* at 55.) Lemieux began walking the train, "looking for any . . . safety issues, any . . . problems, . . . anything that need[ed] to be fixed." (*Id.*) He noted that an air hose was leaking and that numerous brake pads were not compliant, including the pads on three of

the first five cars. (*Id.* at 55-56.) One such pad was "definitely not safe" because it was missing "a major portion" of the pad and was "worn down." (*Id.* at 55.) CP did not provide Lemieux with tools to measure brake pads, so Lemieux used his personal Leatherman to measure it. (*Id.*) His measurement revealed that the brake pad came out below three eighths of an inch, including the backing. (*Id.*)

Lemieux completed the inspection of the entire train, which took somewhere between 1.5-2 hours. (*Id.* at 56.) Based on his training, he did not report the brake problems until after he completed the whole inspection. (*Id.*) Ultimately, Lemieux "bad ordered" about 56 cars due to bad brake shoes. (*Id.* at 58.) He called dispatch at 4:00 or 4:30 p.m. to report the non-compliant brake shoes and leaking air hose. (*Id.*; Donesky Decl. ¶ 12, Ex. K ("Tr.") at 44-45, Docket No. 167.)

Keith Kary, the Glenwood train master, and Michael Downer, a St. Paul mechanical manager, were not notified about the bad order cars until around 6:35 p.m. (Tr. at 4, 13, 45.) They arrived at the train between 8:00-8:30 p.m. (*Id.* at 46.) Kary testified that he looked at four or five cars and "took no exception to th[e] cars that [Lemieux] showed [him]," finding that they were "legal . . . at least three-eighths of an inch." (*Id.* at 14.) Lemieux testified that Kary said that the first few brake shoes appeared "close to three-eighths," but said that, since he did not have a measuring device, he could not say for sure whether they were sufficient and safe for travel. (*Id.* at 47.) Downer testified that he "did not find one exception to the brake shoes" and that there were "absolutely no bad orders in that train whatsoever." (*Id.* at 17.) According to Lemieux, Downer said, "just by looking at [the brake pads] that they were greater than three-eighths" and, even if they needed to

be repaired, they were safe to travel to the St. Paul yard for repairs. (*Id.* at 48.) Lemieux testified that allowing the train to travel in that state was not consistent with the GOI or the Class I Air Test, which demands "100 percent rule compliance." (*Id.* at 48-49.)

Qualified mechanics also came out to inspect the brake shoes that Lemieux had bad ordered and found none of them to be bad ordered. (*Id.* at 17-19.) Lemieux did not see them do the measurements. (Lemieux Dep. at 58.) Neither Kary nor Downer physically measured the brake shoes, and Downer acknowledged that he did not see any of the measurements that were being taken. (Tr. at 76.)

Kary testified that Lemeiux's report of 56 bad ordered cars caused train delay in violation of GCOR-1.29. (Tr. at 24.)

## 2.    Hearing

On February 18, 2015, CP sent Lemieux a notice ordering him to appear for a formal hearing regarding the train delay. (Fuller Decl. ¶ 3, Ex. 6 at 24.) This hearing was required by the CBA that governed the terms of Lemieux's unionized employment. (Lemieux Dep. at 24, 39.)

Jeffrey McInnis, road foreman of engines in St. Paul, conducted the hearing on February 27, 2015. (Tr. at 1-2; Fuller Decl. ¶ 3, Ex. 23 ("McInnis Dep.") at 3.) The hearing and investigation relied only on testimony from Lemieux, █████ Kary, and Downer. (Tr. at 2-3.) McInnis denied Lemieux's request to have the union carmen – the only people who had physically measured the brake shoes – testify. (McInnis Dep. at 21.) McInnis also failed to pull audio tapes into the investigation that would have clarified the timing and details of Lemieux's report. (*Id.* at 39-40.)

McInnis did not question Lemieux's honesty in reporting defective brakes. (*Id.* at 25.) He acknowledges that CP wants its employees "to report anything they think could be a possible safety issue with the train" and that Lemieux's report of the air brake hose as a bad order was accurate. (*Id.* at 25, 28.)

### 3. Discipline

On March 5, 2018, McInnis recommended to Tom Jared, a CP superintendent in Minnesota, that Lemieux receive a 5-day unpaid suspension, "an advancement of one step in the U.S. discipline policy," because "[b]ad orders were improperly identified as such, as well as not reported in a timely manner." (Fuller Decl. ¶ 3, Ex. 8 at 28-29; Fuller Decl. ¶ 3, Ex. 14 at 6.) The same day, Jared agreed with McInnis's recommendation, and passed it along to Mark Redd. (Fuller Decl. ¶ 3, Ex. 8 at 28.) Redd is Senior Vice President of West Region Operations for CP. (Fuller Decl. ¶ 3, Ex. 25 at 86.) He reviewed the hearing transcript and exhibits, as well as the recommendations from McInnis and Jared. (*Id.* at 97.) Redd issued the 5-day unpaid suspension, (*id.* at 96), and it was imposed on March 6, 2015, (Fuller Decl. ¶ 3, Ex. 10 at 37). Redd acknowledges that this instance was Lemieux's first formal infraction. (Fuller Decl. ¶ 3, Ex. 25 at 97.)

### E. Second Alleged Protected Activity: Brake Defects and Frozen Slack Adjuster Report (March 4, 2015)

#### 1. Report

On March 4, 2015, less than a month after his first report and before his suspension was put in place, Lemieux called dispatch to report: (1) brake defects signaled by track detectors, and (2) a car with a frozen slack adjuster. (Lemieux Dep. at 62-64, 68.)

Tom Jared, who the next day would recommend that Lemieux receive a 5-day suspension for the February incident, received a call at around 5:00 a.m. on March 4 informing him that a CP train had been hit by a track detector and had stopped to set out some bad ordered cars. (Donesky Decl. ¶ 16, Ex. O ("2d Tr.") at 5, Mar. 30, 2018, Docket No. 169.) Jared "decided it was a pretty good opportunity . . . to get out and do some testing." (*Id.*) He arrived at the location of Lemieux's train at about 5:35 or 5:40 a.m. but did not see any movement around the train, so he assumed it had already been secured. (*Id.*) Jared "got in position to watch any work events that were going to take place." (*Id.*) Lemieux eventually dismounted and started to secure the train. (*Id.*)

Jared asked dispatch to contact the crew to find out "what their delays were and what was going on." (*Id.*) Dispatch told the crew to secure the train, and the crew began to do so. (*Id.*) After several securement tests, Jared saw Lemieux get in place in time to conduct a roll by of the last 1000 feet of train number 198.[2] (*Id.*) Jared never saw ████ ████, the engineer on the crew, dismount to conduct a roll by. (*Id.*) Jared questioned the crew about why they did not secure the train when first instructed to do so; they responded that "they didn't know whether the instructions were going to change" because it was "common that instructions changed." (*Id.* at 5-6.) Jared felt that the crew had delayed the train and, as a result, they were not in position to roll by train 198. (*Id*. at 6.)

Lemieux's version of the events differs. According to Lemieux, while he and ████ were trying to resolve the detected brake issues, Jared "showed up and started harassing

---

[2] The parties refer to train 198 and train 198-28 interchangeably.

[them]." (Lemieux Dep. at 64.) Lemieux admitted that he did not secure the train immediately after receiving instructions to do so from the dispatcher. (*Id*.) He said that he and ███ waited to secure the train because they wanted to warm up; he had just been outside for 30-45 minutes, and the temperature was ten degrees below zero with winds of nine miles per hour.[3] (2d Tr. at 14-15.) He also said that it would have been impossible to secure the train more quickly given all the tasks they were attempting to complete. (*Id*. at 17.) Lemieux further contended that he rolled by all of trains 497-03, 198, and 581, and that ███ rolled by 497-03 and 581 but was conducting a safety-sensitive engineering duty when train 198 passed by and was thus unable to roll by it. (*Id*. at 14, 17.)

Similar to Lemieux, ███ said that Jared "spent over 15 minutes yelling, harassing, belittling, and even threatening [Lemieux and him] with investigation and suspension." (2d Fuller Decl. ¶ 3, Ex. 39 at 9.) ███ said that "at no time . . . did [Jared] take a moment to hear what [he and Lemieux] had to say" and that Jared told them they should have ignored dispatch's instructions. (*Id*.) ███ testified that he completed a roll by of trains 497-03 and 581 and that Lemieux was in position when train 198 began to pass by them. (2d Tr. at 19-20.)

### 2. Hearing

CP notified Lemieux on March 10, 2015, that it would hold a hearing regarding his alleged failure to perform a roll-by inspection of trains 497-03 and 198, as well as further

---

[3] CP notes that part of the job description of a conductor is working "outdoors 30% to 100% of the time with exposure to marked changes in temperature and humidity including extreme heat, cold, ice, rain and snow." (Donesky Decl. ¶ 4, Ex. C at 7, Mar. 30, 2018, Docket No. 157.)

delay of his assigned train. (Fuller Decl. ¶ 3, Ex. 12 at 41.) The hearing was held on March 31, 2015, and April 3, 2015. (2d Tr. at 1, 39.) Lemieux's union representative asked to present evidence that included: footage from trains 497-03 and 198 during the relevant times; testimony of the crews of the two trains; and all taped conversations between Lemieux, his crew, and dispatch. (Fuller Decl. ¶ 3, Exs. 17-18 at 58-61.) This request was denied. (Fuller Decl. ¶ 3, Ex. 19 at 62.)

Kary, the same CP employee who testified against Lemieux regarding the February incident, presided over the hearing regarding the March incident. (2d Tr. at 1, 39.) The only witness other than Lemieux and ███ was Jared, who had recommended less than a month earlier that Lemieux be given a 5-day unpaid suspension. (*Id.*)

### 3. Discipline

Kary found that there was "sufficient evidence to support the conclusion" that Lemieux and ███ violated GCOR-1.29 and 6.29.1. (Fuller Decl. ¶ 3, Ex. 15 at 55.) In his findings, the only evidence he referenced was Jared's testimony that "[t]hey should have in [his] opinion secured the train" when first instructed. (*Id.* at 56.) Kary recommended that both Lemieux and ███ serve a 10-day suspension "in accordance with . . . policy." (*Id.*) Redd emailed Robert Johnson, CP's Executive VP of Operations, on April 13, 2015, noting that both employees should serve a 10-day suspension "based solely on progression." (*Id.* at 55.) However, he ultimately recommended that ███'s discipline "be elevated to 30 days skipping his next step discipline due to the severity and multiple events" because he was out of compliance on both roll-by inspections. (*Id.* at 54-55.) He did not make a similar note regarding Lemieux. (*Id.*) Johnson is not usually consulted to

determine the significance or severity of events as related to discipline. (Fuller Decl. ¶ 3, Ex. 26 ("Johnson Dep.") at 121.)

On April 13, 2015, despite both Redd and Kary's belief that CP policy only warranted a 10-day suspension, CP notified Lemieux that he was "dismissed from employment, effective immediately." (Fuller Decl. ¶ 3, Ex. 16 at 57.)

### F. CP's Treatment of Similarly-Situated Employees

#### 1. Violations of GCOR-1.29 (Unnecessary Delay)

CP alleges that it disciplined four other employees who caused unnecessary delay in violation of GCOR-1.29 with discipline up to and including dismissal. An engineer was dismissed for such a violation but was also found to have violated three other rules at the same time. (Decl. of Justin Dittrich-Bigley ("Bigley Decl.") ¶ 12, Ex. F at 1, Mar. 30, 2018, Docket No. 139.) Two conductors were dismissed, but on was found to have violated three rules at one time, (Bigley Decl. ¶ 14, Ex. H at 1, Mar. 30, 2018, Docket No. 140), and one was found to have violated five rules at one time, (Bigley Decl. ¶ 13, Ex. G, Mar. 30, 2018, Docket No. 137). Another conductor, who was found to have violated two rules, was given a five-day suspension. (Bigley Decl. ¶ 15, Ex. I at 1, Mar. 31, 2018, Docket No. 177.) Lemieux alleges that at least ten other employees who were found in violation of GCOR-1.29 were given lesser punishments, ranging from letters of reprimand to a 15-day suspension. (2d. Fuller Decl. ¶ 3, Exs. 68-78.)

#### 2. Failure to Perform Roll-by Inspection

CP alleges that it issued hearing notices to an engineer and conductor who failed to perform a roll-by inspection, but – in lieu of hearings – they signed waivers acknowledging

responsibility and accepting 30-day suspensions. (Bigley Decl. ¶¶ 16-17, Ex. J-K, Mar. 30, 2018, Docket Nos. 141, 143.) CP also alleges that it dismissed a conductor for failing to properly conduct a roll-by inspection. (Bigley Decl. ¶ 26, Ex. T at 1, Mar. 30, 2018, Docket No. 156.) Lemieux alleges that at least twenty-six other conductors who failed to perform roll-by inspections were not terminated. (2d Fuller Decl. ¶ 3, Exs. 41-67.) Some received no discipline, others received letters of reprimand, and others received suspensions for five to thirty days. (*Id.*)

### 3. Escalation of Discipline

CP alleges that, in the case of at least six employees, it escalated discipline to dismissal even though the employees' prior discipline records contained only 5-day suspensions or less. However, some additional facts are notable. Two of the six employees were found to have violated four or more rules at one time. (Bigley Decl. ¶ 19, Ex. M at 1, Mar. 30, 2018, Docket No. 152; Bigley Decl. ¶ 22, Ex. P at 1, Mar. 30, 2018, Docket No. 154.) Two more employees were sleeping on the job. (Bigley Decl. ¶ 19, Ex. L at 1, Mar. 30, 2018, Docket No. 196; Bigley Decl. ¶ 21, Ex. O at 1, Mar. 30, 2018, Docket No. 153.) One employee was playing games on his phone during work. (Bigley Decl. ¶ 23, Ex. Q at 1, 16-19, Mar. 30, 2018, Docket No. 155.) Another employee was accused of unauthorized absences and job abandonment on five dates. (Bigley Decl. ¶ 20, Ex. N at 1, Mar. 30, 2018, Docket No. 145.) Lemieux alleges that other employees with similar discipline records have not been terminated, even when they had multiple violations at one time. (Fuller Decl. ¶ 3, Exs. 21-22.)

### G.    CP's Compensation Scheme and Corporate Culture

Lemieux alleges that he was terminated because CP's shareholders rely on the fast movement of trains, as delays decrease CP's ability to generate revenue. (*See* Johnson Dep. at 123, 142-43.) Annual bonuses of managers like Redd, McInnis, and Johnson are based in part on "having positive train speed." (*Id.*; McInnis Dep. at 36-37.) But Johnson claims that safety and productivity "go hand in hand together" for CP. (Johnson Dep. at 144.) When asked whether he "would rather have employees, as a practice, report even a questionable defect knowing that it's going to delay a train, th[a]n send it through the territory," Johnson responded: "They're required to." (*Id.*)

Lemieux also alleges that CP has a corporate culture of harassing and intimidating employees who raise safety concerns. In a January 2014 letter to CP's Vice President of U.S. Operations, the legislative director for the United Transportation Union wrote that "[s]afety conditions are deteriorating and increasingly dangerous," that "trains have been ordered to depart with mechanical defects," and that an "environment of harassment and intimidation from carrier managers on train crews continues to exist." (Fuller Decl. ¶ 3, Ex. 29 at 152, 154.) The same letter states that "[m]any employees no longer report safety and operational exceptions in fear of retaliation by local CP managers against their employment." (*Id*. at 156.)

## II.    PROCEDURAL BACKGROUND

Lemieux first challenged his 5-day suspension and dismissal through his CBA. (Lemieux Dep. at 39.) He also filed a complaint with OSHA challenging the same actions,

but OSHA never commenced an investigation. *Lemieux v. Soo Line R.R. Co.*, No. 16-1794 (JRT/HB), 2017 WL 3535292, at *1 (D. Minn. Aug. 16, 2017). In accordance with 49 U.S.C. § 20109(d)(3), Lemieux informed OSHA after more than 210 days passed that he would file a complaint in federal district court, and OSHA dismissed the OSHA complaint. *Id.* On June 1, 2016, Lemieux filed the present action. (Compl., June 1, 2016, Docket No. 1.) He later filed an amended complaint, adding factual allegations related to the March 4, 2015, incident. (Am. Compl., Nov. 22, 2016, Docket No. 21.) Presently before the Court are the parties' cross-motions for summary judgment. (Pl.'s Mot. for Partial Summ. J., Mar. 30, 2018, Docket No. 103; Def.'s Mot. for Summ. J., Mar. 30, 2018, Docket No. 106.)

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter." *Quick v. Donaldson Co.*,

90 F.3d 1372, 1376-77 (8th Cir. 1996). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [his] favor." *Id.* at 1377.

## II.   LEMIEUX'S PRIMA FACIE CASE

The FRSA prohibits railroad carriers from retaliating against an employee for engaging in certain protected activities, including "reporting, in good faith, a hazardous safety or security condition," and "refusing to work when confronted by a hazardous safety or security condition related to the performance of the employee's duties." 49 U.S.C. §§ 20109(b)(1)(A), (b)(1)(B). To establish a prima facie case of retaliation, Lemieux must show that "(i) he engaged in a protected activity; (ii) [CP] knew or suspected, actually or constructively, that he engaged in the protected activity; (iii) he suffered an adverse action; and (iv) the circumstances raise an inference that the protected activity was a contributing factor in the adverse action." *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014).

Only two elements of the prima facie case are disputed by the parties: (1) whether Lemieux engaged in FRSA-protected activity, and (2) whether this activity was a contributing factor in CP's disciplinary decisions.

### A. Protected Activity

#### 1. February Incident – "Good Faith" Report

CP argues that Lemieux's February brake report was not protected activity under 49 U.S.C. § 20109(b)(1)(A) because it was not made in good faith. At issue is whether "good faith" refers merely to an employee's subjective belief or whether it also requires the belief to be objectively reasonable, a question that the Eighth Circuit has not yet answered.

CP argues that good faith requires both subjective genuineness **and** objective reasonableness, and cites several cases to support its position. *See Gutierrez v. Norfolk & S. Ry. Co*., No. 12-C-2396, 2014 WL 551684, at *4 (N.D. Ill. Feb. 12, 2014); *Hernandez v. Metro-N. Commuter R.R.*, 74 F. Supp. 3d 576, 580 (S.D.N.Y. 2015); *Jacek v. Soo Line R.R.*, 2014-FRS-91, ALJ's Decision and Order at 2 (Dep't of Labor May 29, 2015), *aff'd* ARB, *aff'd on other grounds* 17-2862 (7th Cir. May 21, 2018). *Gutierrez* and *Hernandez* are inapposite because they involved interpretations of "reasonably believes" under 49 U.S.C. § 20109(a)(1), not "good faith" under 49 U.S.C. § 20109(b)(1)(A). The phrases are meaningfully different. "Reasonably" adds an objective component to the subjective "believes." In contrast, "good faith" does not contain an objective component. But *Jacek* does support CP's proposition. There, the Administrative Law Judge found that "[i]n addition to . . . the requirement of good faith, the complainant's belief in the protected activity must be objectively reasonable." *Jacek*, at 2 & n.1.

Lemieux urges the Court to consider only whether, at the time Lemieux reported his safety concerns to CP, he "genuinely believed" that they presented a hazardous safety condition. *See Ray v. Union Pac. RR Co.*, 971 F. Supp. 2d 869, 884 (S.D. Iowa 2013). This interpretation is in line with the plain meaning of "good faith," which Black's Law Dictionary describes as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, . . . or (4) absence of intent to defraud or to seek unconscionable advantage." *Good Faith*, Black's Law Dictionary (10th ed. 2014). Even more persuasively, "acting in good faith" is defined as "[b]ehaving honestly and frankly, without any intent to defraud or to seek an unconscionable advantage." *Acting In Good*

*Faith,* Black's Law Dictionary (10th ed. 2014).[4]  Nevertheless, Lemieux asserts that his conduct satisfies "good faith" under either standard.

Ultimately the Court need not decide the issue at this time because there remains a dispute of material fact under either interpretation.[5]  Thus, the Court will deny summary judgment on this issue.

To argue that Lemieux's belief that the brake pads were non-conforming was not objectively reasonable, CP notes that mechanics measured the brake pads and found them to be conforming.  But, under CP's proposed interpretation of "good faith," CP must show that "a reasonable person in the **same factual circumstances** with the **same training and experience** as the aggrieved employee" would have found differently.  *See Hernandez*, 74 F. Supp. 3d at 580 (emphasis added).  CP's mechanics have more extensive training on brake pads and have the proper tools to measure them.  Lemieux had less training and measured the brakes with the only tool he had on hand, his own personal Leatherman.

CP next argues that Lemieux's report was not made in good faith because he waited until the investigation was complete before notifying dispatch.  But Lemieux testified that his actions were consistent with his training and that it would not have made sense for him to radio dispatch every few minutes to report each brake.

---

[4] Even if the Court were to find that "good faith" requires only a subjective component, CP could present evidence that Lemieux's belief was unreasonable to suggest that Lemieux's asserted belief that the conditions were hazardous is not genuine.

[5] Given that the interpretation is not dispositive at this time, the Court finds it appropriate to wait until pretrial motions to decide this question, at which point the Eighth Circuit may have had an opportunity to decide.

Finally, CP argues that Lemieux's report was not objectively reasonable because bad ordering 56 cars is "unprecedented." (Def.'s Supp. Mem. at 21, Mar. 30, 2018, Docket No. 171.) But a report being unprecedented does not make it untrue. Ultimately, these are disputes of material fact that must be left to the jury.

### 2. February Incident – Refusal

CP also argues that Lemieux's February brake report did not constitute a "refusal" under 49 U.S.C. § 20109(b)(1)(C) because no reasonable individual would conclude that the hazardous safety condition he found would present "an imminent danger of death or serious injury." McInnis testified that, even if the brakes were non-conforming, they would not create an imminent danger of death or serious injury. (McInnis Dep. at 15, 29.) But CP's policies suggest otherwise. Employees are required to conduct air brake tests, which demand 100% conformance, and CP removes brake pads that are below a standard width. Given these policies, a reasonable employee could conclude that 56 cars with bad brakes creates an imminent danger, especially when the train was carrying hazardous materials and traveling in the winter, when there might be icy or snowy conditions.

Notably, CP does not dispute that Lemieux's February report of the leaking air hose was made in good faith and was in fact hazardous.

### 3. March Incident

CP argues that the March incident did not constitute a refusal because it was not a "drastic" safety issue, citing Kary's testimony that such issues can routinely be fixed by the crew on their tour of duty. (Def.'s Supp. Mem. at 23.) Lemieux argues that the March incident constituted a protected report because a crew must stop when notified by certain

track detectors and failure to stop would subject him to dismissal. A genuine dispute of material fact remains as to whether the March incident was a protected activity.

### B.    Contributing Factor

To sustain his prima facie case, Lemieux must next show that "the circumstances raise an inference that [his] protected activity was a contributing factor" in the adverse employment actions. *Kuduk*, 768 F.3d at 789. A contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Id*. at 791 (quoting *Procedures for the Handling of Retaliation Complaints under the NTSSA and the FRSA*, 75 FR 53522-01, 53524 (Aug. 31, 2010)).

Lemieux need not "conclusively demonstrate [CP's] retaliatory motive." *Id*. at 791 (quoting *Coppinger–Martin v. Solis*, 627 F.3d 745, 750 (9th Cir. 2010)). Instead, under the "more lenient 'contributing factor' causation standard," *id*. at 792, Lemieux must show "by a preponderance of the evidence" that CP intentionally retaliated against him for "engaging in protected activity." *Gunderson v. BNSF Ry. Co.*, 2015 WL 4545390, at *8 (PJS/HB) (D. Minn. July 28, 2015), *aff'd*, 850 F.3d 962 (8th Cir. 2017) (quoting *Kuduk*, 768 F.3d at 791). "In other words, although it need not be the determinative factor," Lemieux must establish that "an unlawful retaliatory motive – or 'discriminatory animus' – . . . contributed in some way to [CP's] decision." *Id*. (quoting *Kuduk*, 768 F.3d at 791 & n.4).

Intentional retaliation can be shown with circumstantial evidence, including but not limited to evidence of "temporal proximity, pretext, shifting explanations by the employer, antagonism or hostility toward the plaintiff's protected activity, . . . or a change in the

employer's attitude toward plaintiff after he/she engaged in protected activity." *Kuduk*, 980 F. Supp. 2d at 1101.

### 1. Temporal Proximity

While temporal proximity alone is not enough, the more lenient "contributing factor" standard "increase[s] to some extent the probative value of temporal proximity." *Heim v. BNSF Ry. Co.*, 849 F.3d 723, 727 (8th Cir. 2017), *cert. denied*, 138 S. Ct. 268 (2017) (quoting *Kuduk*, 768 F.3d at 792). "Although the temporal proximity between the protected activity and the alleged retaliatory act must generally be 'very close,' the 'employee may attempt to shorten the gap between [the] protected activity and the adverse action by showing that shortly after [the employee] engaged in the protected activity, the employer took escalating adverse and retaliatory action against [the employee].'" *Heaton v. The Weitz Co.*, 534 F.3d 882, 888 (8th Cir. 2008) (alterations in original) (quoting *Hite v. Vermeer Mfg. Co.*, 446 F.3d 858, 866 (8th Cir. 2006)). Lemieux presents evidence of both temporal proximity and escalating retaliatory action.

Lemieux reported the 56 rail cars on February 12, 2015. CP sent Lemieux a notice regarding a hearing only 6 days later (February 18), and the hearing was held 9 days after the notice was sent (February 27). Lemieux was suspended on March 6. On March 4, two days prior to Lemieux's suspension, Jared conducted an efficiency test on Lemieux's crew and opined that Lemieux failed to secure his train quickly enough and failed to roll by train 198. One day later, and one day before Lemieux was suspended, Jared concurred in the recommendation that Lemieux be suspended for the first incident. On March 10, four days after his suspension, Lemieux received notice of the second hearing. The hearing was held

on two days within the next month: March 31 and April 3. Lemieux received his termination letter on April 13, just over a month after his first suspension and just over two months after his February brake report.

CP argues that any temporal chain was cut off as a matter of law because of Lemieux's intervening, unprotected conduct: failing to tie down his train when instructed on March 4, 2015. CP cites *Kiel v. Select Artificials, Inc.*, a case in which the plaintiff made a protected communication but later insulted a superior and indulged in an angry outburst in the presence of co-workers. 169 F.3d 1131, 1136 (8th Cir. 1999). The Eighth Circuit found that this "intervening unprotected conduct eroded any causal connection that was suggested by the temporal proximity of his protected conduct and his termination." *Id.* Here, however, the protected conduct and any intervening, unprotected conduct are much more closely intertwined. *Cf. Dafoe v BNSF Ry. Co.*, 164 F. Supp. 3d 1101, 1115 (D. Minn. 2016) (finding "significant" that plaintiff's "protected activity . . . was completely unrelated to the . . . incident that led to his discharge" and that "the facts surrounding [plaintiff's] protected activity shared no nexus with the later serious rule violations.") For Lemieux, both protected activities were closely related to the resulting discipline.

Furthermore, Jared's close involvement with both incidents and their resulting discipline may raise an inference of animus. Jared recommended that Lemieux be suspended for the February incident just one day after allegedly harassing him and █████. He was then the only third-party witness to testify regarding the March incident and his

testimony contradicted that of both Lemieux and ███. Ultimately, the hearing officer's findings with regard to the March incident were based primarily on Jared's testimony.

On the facts of this case, Lemieux's intervening unprotected conduct does not cut off the temporal chain as a matter of law. Whether CP disciplined Lemieux for protected or unprotected conduct remains a dispute of fact for the jury.[6]

### 2. CP's Selective Enforcement of its Discipline Policy

Lemieux presents evidence that at least ten other employees who caused unnecessary delay were given lesser punishments, ranging from a letter of reprimand to a 10-day suspension. CP presents evidence that it disciplined four other employees who caused unnecessary delays with discipline up to and including dismissal. But three of the referenced employees violated three or four other rules at the same time, and the remaining employee received only a 5-day suspension.

Lemieux presents evidence that at least twenty-six other CP conductors who failed to perform roll-by inspections were not terminated. CP presents evidence that it issued hearing notices to an engineer and conductor who failed to perform a roll-by inspection, but – in lieu of hearings – they signed waivers acknowledging responsibility and accepting 30-day suspensions. CP also dismissed one conductor for failing to properly conduct a roll-by inspection.

---

[6] CP also argues that the fact that Lemieux was previously counseled regarding performance concerns negates a finding of retaliation. *See Guimaraes v. SuperValu, Inc.*, 674 F.3d 962, 978 (8th Cir. 2012). In *Guimares* the performance concerns were persistent, lasted until the time of the plaintiff's report of discriminatory treatment, and were directly related to the employer's adverse action. *Id.* In the present case, Lemieux was not in the midst of ongoing counseling related to performance issues and neither prior incident was related to the February 12 or March 4 reports or to his resulting discipline.

Lemieux presents evidence that other employees with similar discipline records were not terminated, even when they had multiple violations at one time. CP presents evidence that it dismissed at least six employees for rule violations even when their prior discipline records were 5-day suspensions or less. But the facts in those cases were distinct: two employees violated four or more rules at one time, two employees were sleeping on the job, another employee was playing games on his phone during work, and another employee was accused of unauthorized absences and job abandonment on five dates.

Few, if any, of the employees in CP's examples appear to be similarly situated. CP certainly has not demonstrated that it applies its policies consistently. As in *Ray*, "Defendant's own records raise a genuine issue of material fact as to whether employees are uniformly terminated for [similar] conduct violations . . . ." 971 F. Supp. 2d at 890. This dispute must go to a jury.

### 3. Evidence of Pretext or Animus

Lemieux argues that CP failed to conduct fair and impartial hearings, which suggests pretext or animus. Lemieux points to several factors that suggest pretext: (1) personnel in both hearings refused to consider evidence from eyewitnesses; (2) the manager presiding over the second hearing testified against Lemieux in the first hearing; and (3) in the second hearing, the only third-party witness to testify was Jared, who had been involved in recommending Lemieux's discipline after the first hearing. These factors – especially viewed in combination – create a reasonable inference of pretext. Jared's involvement is particularly problematic because his testimony contradicted that of Lemieux and ███, yet no other witnesses were called, and the hearing officer's

recommendations were based primarily on Jared's testimony. Furthermore, Lemieux and

████ testified that Jared harassed and threatened them during the March incident, which

may suggest animus.

CP dismisses these procedural shortcomings, noting that "federal courts do not sit

as a super-personnel department that reexamines an employer's disciplinary decisions."

*Dafoe*, 164 F. Supp. 3d at 1113 (quoting *Kuduk*, 768 F.3d at 792). In *Dafoe*, the Court

said:

> [I]t is not unlawful for a company to make employment
> decisions based upon erroneous information and evaluations.
> Thus, even if [Defendant] . . . failed to consider certain
> evidence, or relied on deficient evidence, this conduct, in and
> of itself, is not unlawful. [Plaintiff] must show that this
> purported conduct was a pretext for intentional retaliation, and
> he has not done so. [Defendant] has offered undisputed
> evidence that [its procedure] was a standard practice.

*Id.* However, unlike in *Dafoe*, CP has not provided undisputed evidence that its procedural

shortcomings were standard practice.

CP also argues that its thorough, multi-level review process belies retaliatory intent.

*See Kuduk*, 768 F.3d at 792. In *Kuduk*, the plaintiff was able to present witnesses, and the

evidence was presented to a disinterested General Manager. *Id.* Here, on the other hand,

Lemieux was not allowed to present testimony of certain witnesses or favorable evidence,

and the evidence in the second hearing was presented to a manager who testified against

Lemieux in the first hearing. Furthermore, CP's review seems to have been multi-level in

name only, given that no lower-level manager recommended dismissal after the March

incident, yet Lemieux was dismissed. A jury could find that the procedures used throughout this process were pretext for retaliation.

Lemieux also argues that CP's justifications for its disciplinary decisions have shifted, although really his argument is that his termination was not in line with intermediate managers' disciplinary recommendations. Evidence that CP did not follow the recommendations of intermediate managers and did not follow its standard policy of progressive discipline – especially when viewed alongside evidence of CP's treatment of other employees – contributes to an inference of pretext and animus.

CP alleges that Lemieux regularly reported safety issues and was never before disciplined, which belies Lemieux's allegations of hostility and animus. While this evidence weighs against a finding of animus, *see Dafoe*, 164 F. Supp. 3d at 1115, it is not dispositive in this case. As CP notes, Lemieux's February brake report was viewed as unprecedented. On the one hand, this evidence may weigh against the genuine or reasonable nature of his report; however, another reasonable inference is that such an extreme report might incite more animus on the part of CP, even if Lemieux's earlier reports did not incite such animus.

### 4. CP's Corporate Culture and Compensation Program

Like temporal proximity, evidence of a carrier's compensation program alone is insufficient to survive summary judgment. *Heim*, 849 F.3d at 727. But, in *Heim*, the record showed that bonus calculations were based on a company-wide reduction of reportable injuries, not on individual managers' reduction of the same. *Id.* Here, individual managers were individually responsible for meeting various goals. While Lemieux's evidence of

CP's corporate culture and compensation program is insufficient alone to sustain a prima facie case, it can be considered by a jury alongside the other evidence.

Lemieux has presented sufficient evidence to raise an inference that his protected activity was a contributing factor in CP's disciplinary decisions. As such, he has established a prima facie case of retaliation, and whether his protected activity did in fact contribute to CP's disciplinary decisions is a question for the jury. As such, the Court will deny both parties' motions for summary judgment.

## III.   CP's Affirmative Defense

Although Lemieux has established a prima facie case, CP could avoid liability by proving "by clear and convincing evidence, that it would have taken the same unfavorable personnel action[s] in the absence of [Lemieux's] protected activity." *Kuduk*, 768 F.3d at 789 (quoting 49 U.S.C. § 42121(b)(2)(B)(iv)). Clear and convincing evidence "place[s] in the ultimate factfinder an abiding conviction that the truth of its factual contentions [is] highly probable." *Cornell v. Nix*, 119 F.3d 1329, 1335 (8th Cir. 1997) (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)). However, "this affirmative defense is often not suitable for summary judgment determination." *Kuduk*, 768 F.3d at 793.

Here, CP has not sustained its affirmative defense. Lemieux presents evidence of numerous employees that CP treated differently despite their violations of the same rules. CP argues that Lemieux's evidence is unavailing because the employees were differently situated. But CP's countervailing evidence suffers from the same deficiency. The

employees that CP claims were similarly treated were dismissed for very different rule violations (e.g. sleeping on the job) or for violations of four or five rules at one time.

CP argues that the fact that it fired █████, the engineer involved in the March incident, is legally conclusive evidence to sustain its affirmative defense. Not so. In this case, █████ was not similarly situated. He was found to have completed no roll-by inspections on the day in question, where Lemieux was found to have completed all but a portion of one. In fact, because of this distinction, Redd recommended that Lemieux receive a 10-day suspension and █████ receive a 30-day suspension. But both were ultimately fired. The decisionmakers recognized a difference between the employees but gave Lemieux the same punishment.[7]

---

[7] CP argues that Courts have granted summary judgment on this affirmative defense despite less compelling evidence, citing *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 969 (8th Cir. 2017); *Kuduk*, 768 F.3d at 793; and *Dafoe*, 164 F. Supp. 3d at 1116. All three cases are distinguishable.

Here, the disciplinary investigations that led to Lemieux's suspension and dismissal were closely intertwined with his protected activity. *Cf. Gunderson*, 850 F.3d at 969. Lemieux was not involved in extreme independent conduct like repeated, serious harassment. *Cf. id.* at 969-70. Managers recommending discipline were not completely independent from the investigations. *Cf. id.* Furthermore, while the decision to dismiss Lemieux was made by a higher-level manager, the decision was out-of-line with lower-level managers' recommendations. *Cf. id.*

CP did not allow Lemieux to present certain evidence and witnesses, the evidence heard regarding the March incident was evaluated by a manager who had testified against Lemieux regarding the February incident, and CP has not shown that it consistently enforced its disciplinary policies. *Cf. Kuduk*, 768 F.3d at 792-93.

Furthermore, CP has not shown that it consistently enforces the policies and rules at issue, Lemieux's unprotected conduct was closely intertwined with his protected activities, and – again – Lemieux's unprotected activity did not have the same independent significance as the conduct in *Gunderson*. *Cf. Dafoe*, 164 F. Supp. 3d at 1116-17.

Because CP has not shown by clear and convincing evidence at this stage that it would have disciplined Lemieux the same way absent any protected activity, the Court will deny CP's motion for summary judgment as to its affirmative defense.

## CONCLUSION

Because disputes of material fact remain as to whether Lemieux's conduct constituted protected activities under the FRSA and as to whether the conduct was a contributing factor in CP's disciplinary actions, the Court will deny both parties' motions for summary judgment as to all claims and issues.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Lemieux's Motion for Partial Summary Judgment [Docket No. 103] is **DENIED**; and

2. CP's Motion for Summary Judgment [Docket No. 106] is **DENIED**.

The parties shall show cause on or before fourteen (14) days from the date of this Order why the Court should not unseal the Order and specify any portion of the Order that warrants redaction.

DATED:  October 15, 2018                      _____ s/John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                             Chief Judge
                             United States District Court